UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael Whalen,

       Plaintiff,

v.

David Langfellow, Officer Weigel,
Sergeant Bryant Gaden, Sergeant Rich
Munoz, Sergeant Jane Mead, Peter A.
Bravo, Peter P. Bydzovsky, Arnulfo
Curiel, Steven J. Frazer, Theodore
Gillet, Officer David J. Longbehn,
Justin L. Paulson, Officer Strokes,
Matthew D. Toronto, David H. Yang,
Officers "A," "B," "C," "D," and "E,"
and the City of St. Paul,

       Defendants.

Civil No. 09-458 (JNE/JJG)
ORDER

---

Peter J. Nickitas, Esq., Peter J. Nickitas Law Office, LLC, and Theodore D. Dooley, Esq., Ted
Dooley Law Office, L.L.C., appeared for Plaintiff Michael Whalen.

Jason M. Hively, Esq., Iverson Reuvers, LLC, appeared for Defendants.

---

On August 30, 2008, City of St. Paul (City) police officers searched a side-by-side duplex

located at 949 and 951 Iglehart, St. Paul, Minnesota.  The searches were conducted pursuant to

two search warrants.  Michael Whalen, the owner of the duplex, asserts violations of the First

and Fourth Amendments under 42 U.S.C. § 1983 (2006) by several named and unnamed City

police officers.  He also asserts a violation of the Privacy Protection Act, 42 U.S.C. § 2000aa

(2006), against the City and state-law claims against the City and the individual defendants.  The

case is before the Court on Defendants' motion for summary judgment.  For the reasons set forth

below, the Court grants the motion.[1]

---

[1]    At the hearing on Defendants' motion for summary judgment, Whalen moved to dismiss
his claims against all the individual defendants except David Langfellow and Steven J. Frazer.
Those claims are dismissed with prejudice.

# I.    BACKGROUND

## A.    Pre-warrant activity

David Langfellow, a City police officer, was a member of the FBI Joint Terrorism Task Force (JTTF) on August 30, 2008.  Most of his duties at that time related to the 2008 Republican National Convention (RNC), which took place from September 1 to September 4.  On August 30, the FBI was surveilling Whalen's duplex for reasons unconnected to this case.  An FBI agent informed Langfellow that the surveillance team had observed a postal carrier deliver a large number of boxes to 951 Iglehart that morning.  The FBI agent indicated that the surveillance team was worried that the boxes, whose delivery required several trips by the postal carrier, could contain weapons.  A different FBI agent informed Langfellow that information from another ongoing FBI investigation indicated that the boxes could contain weapons.

Langfellow offered to draft a search warrant application for 951 Iglehart.  Because the FBI did not want Langfellow to use information from its investigation in the affidavit, the City sent a police officer to speak with the postal carrier.  Langfellow asked the police officer to gather additional information about the boxes, including whether they leaked or if materials shifted inside of them.  The postal carrier confirmed only that he delivered about twenty heavy boxes to 951 Iglehart and that he made multiple trips to deliver them.

Langfellow searched Hennepin County property tax records for information about the property.  Based on those records, he determined that Whalen owned 951 Iglehart.  According to Langfellow, he also "figured out" from those records that Whalen was the co-owner of the Arise bookstore in Minneapolis and that the other co-owner was Kathleen Soliah a/k/a Sarah Jane Olson.  Olson pleaded guilty in 2001 to two counts of possessing explosives with the intent to murder while a member of the Symbionese Liberation Army (SLA) in the 1970's.  Langfellow

described the Arise bookstore as the "jump-off point" for the "RNC Welcoming Committee" during the RNC. Langfellow, who was familiar with the RNC Welcoming Committee due to his work on the JTTF, described the organization as an anarchist group. Finally, Langfellow had learned from the FBI that Whalen had been under investigation in the 1990's for supporting international terrorism.

While Langfellow was drafting the search warrant application, a county deputy from Wisconsin and an FBI agent from the Wisconsin division conducted a knock-and-talk at 951 Iglehart. The Wisconsin law enforcement officers did not inform the JTTF, the City, or the Secret Service of their intentions before conducting the knock-and-talk. According to Langfellow, "chaos" ensued once the Wisconsin law enforcement officers left the property. Occupants of the duplex emerged and began looking around, which Langfellow interpreted as searching for surveillance. Cars began arriving at the property and two of the occupants left in a car while three others left on bicycles. The surveillance team reported over the radio to Langfellow that Whalen and another person had left the property after the knock-and-talk in a black Chevrolet Cobalt. The police stopped the Cobalt and detained its occupants.

City police secured the property after the knock-and-talk by surrounding it approximately two hours before the search of 951 Iglehart. Langfellow testified that they did so due to concern that the boxes would be removed before the search warrant arrived. During that time, Whalen called local media to alert them to the events occurring at his property.

**B.      951 Iglehart**

The 951 Iglehart warrant affidavit, which was drafted by Langfellow, stated that Whalen was "previously under investigation during the 1990's due to a suspicion that he was supporting international terrorism." It further stated that Hennepin County property tax records indicated

that Whalen "is the co-owner of the Arise Bookstore" and that Olson was the other co-owner of

the Arise Bookstore.  The affidavit explained that Olson was in prison for pleading guilty to two

counts of possessing explosives with intent to murder for a 1975 incident where "she and others

robbed a bank and killed a woman, as an action representing the [SLA]."

> The affidavit also stated:
>
> Over the course of several months and within the past week Affiant has observed
> that the Arise Bookstore has postings in plain view that are clear calls to action
> for unlawful activities including violence to law enforcement and destruction of
> property.  Affiant has observed that there are specific postings related to the
> Republican National Convention that are clearly intended to call people to take
> violent action during the convention.

In addition, the affidavit represented that "[a] statement on the [Arise bookstore] website credits

Whalen with giving support and admiration to [Soliah] and advocating violent direct action

against police during the 2008 Republican National Convention (paraphrased)."

The affidavit then stated that Whalen's address of record was 951 Iglehart, that officers

conducting surveillance had observed that it was a duplex, and that a female also lived at the

address.  According to the affidavit, the postal carrier stated that he had delivered items

addressed to Erin S. Stalnaker, that the house numbers for 951 Iglehart were not displayed, and

that Stalnaker refused to display them when asked to do so.  The affidavit stated that the postal

carrier had posted a paper with the numbers for 951 Iglehart, but it had been removed.  The

affidavit said that City police records indicated that there had been "recent police contacts" with

Stalnaker at 951 Iglehart.

The affidavit then provided the following information about the delivery of heavy boxes

on August 30:

> Affiant has learned from FBI Agent Scott Zimmerman that 21 packages were
> delivered to 951 Iglehart on 8-30-2008.  [The postal carrier] stated that the
> packages were so heavy he could only carry 2 at a time. . . .  Agent Zimmerman

has information from a reliable source that the packages contained weapons that are intended to be used during the RNC. Agent Zimmerman has fully identified the source and obtained contact information. Affiant believes that identifying the source in this Affidavit would present a clear danger to the source.

Next, the affidavit stated that on August 30, while surveilling 951 Iglehart, law enforcement observed Whalen get into a black Chevrolet Cobalt. The affidavit represented that law enforcement "followed the vehicle and attempted to stop it" but "[t]he vehicle fled and was eventually stopped at approximately 1300 hours." The affidavit represented that Whalen was in the vehicle and was being detained by police. In addition, the affidavit said that police officers had observed other occupants trying to leave the house, that there were "numerous individuals in the house at this time," and that "[o]fficers have swept the property and made it safe and are awaiting a search warrant."

Finally, the affidavit requested permission to recover any pagers, cell phones, computers, and "any other devices used for storing data and communicating" because "people involved in criminal activity will often use devices to store data and communicate with associates." The affidavit requested permission to examine the devices and recover any data on them for purposes of the investigation.

A state court judge signed the warrant at 2:08 p.m. City police officers, including Langfellow, arrived at the duplex with the warrant for 951 Iglehart at about 2:45 p.m. Commander Steven J. Frazer was the ranking City police officer on the scene. The officers began executing the warrant at 2:56 p.m. They initially went to the door for 949 Iglehart, but did not enter 949 Iglehart at that time because they were informed by its occupants that 951 Iglehart was the other half of the duplex. The house numbers on 951 Iglehart were painted over; indeed, Whalen testified that one would "have to really look" to see them. In addition, the mailbox for 951 Iglehart had a small note taped to it labeling it as 951 Iglehart.

The police searched 951 Iglehart, but did not find the boxes.  Although the warrant affidavit stated that Whalen had left 951 Iglehart in the Cobalt and was being detained by police with the vehicle, he was actually present at 951 Iglehart during the search.

**C.     949 Iglehart**

Whalen, who lives at 951 Iglehart with Erin Stalnaker and others, also owns 949 Iglehart. He normally rents 949 Iglehart to tenants but it was not leased during the RNC.  Instead, journalists from I-Witness Video, which documents police abuse, were staying there during the RNC at Stalnaker's request.  Whalen did not know the journalists before they arrived, did not know when they arrived at 949 Iglehart, did not meet them before the searches, and was not at all familiar with I-Witness Video.  Nothing on the outside of the duplex indicated that journalists were within or that it was a journalist workspace.

The duplex had only one attic, which was located in 951 Iglehart.  Occupants of 949 Iglehart had access to the attic through a door having a hook-and-eye lock on each side.  In addition, residents of 951 Iglehart could access a shared laundry room located in the basement of 949 Iglehart without a key.

At 3:06 p.m., Langfellow called the state court judge, stated that there was a second address attached to the duplex, and requested a telephonic warrant to search 949 Iglehart.  The state court judge authorized the search of 949 Iglehart over the telephone.[2]  After obtaining the telephonic warrant, the police knocked on the attic door and announced that they were City police officers and had a search warrant.  They said they would force the door if it was not opened and repeated that they were City police officers.  In response to some noise from the other side of the door, an officer shouted that he could not hear the occupants.  At least twenty

---

[2]     Whalen does not allege any constitutional violation based on the officers' reliance on a telephonic warrant or claim that it did not meet the requirements of Rule 36 of the Minnesota Rules of Criminal Procedure.

seconds after the first announcement, the police entered by breaking the hook-and-eye lock on

the 949 Iglehart side of the door.  They found the boxes in 949 Iglehart.  The boxes, which were

addressed to Fred Tyler, one of Whalen's roommates, contained vegan literature.  No weapons or

contraband were found at 949 or 951 Iglehart.  The search ended and the police left the property

at 3:58 p.m.

Whalen and the other occupants of the duplex were handcuffed and detained in the back

yard during the searches of 949 and 951 Iglehart.  Whalen suffered no physical injuries, but he

was humiliated by the incident and his property sustained $110 in damage as a result of the

search.[3]  Whalen testified during his deposition that the police "were very nice" and "weren't

mean" during the searches.

Langfellow discovered that Whalen had not been in the fleeing Cobalt at about 4:00 p.m.,

after the searches of 949 and 951 Iglehart were complete.  Langfellow drafted a written

application for the 949 Iglehart warrant at 4:30 p.m.  The only difference between the 949 and

951 Iglehart applications is the addition of the following paragraph to the 949 Iglehart affidavit:

> Affiant presented the above probable cause to [the state court judge] who granted
> the search warrant.  Affiant served the warrant at 951 Iglehart.  The structure is a
> side by side duplex and there is a common entry that also serves 949 Iglehart.
> Affiant observed that the entire structure is one common living space.  Affiant
> spoke with [Whalen] who stated that he does own and control both sides of the
> structure and both addresses.  Affiant made telephone contact with [the state court
> judge] and explained the circumstances.  [The state court judge] gave verbal
> approval by phone at 1506 hours to Affiant to search the entire structure.  Affiant
> now makes written application for a search warrant for 949 Iglehart.

At the time Langfellow drafted the 949 Iglehart application, he knew that Whalen had not been

in the fleeing Cobalt.  Langfellow testified that the statement about Whalen's presence in the

---

[3]     Whalen's tomato plants and flowers were crushed, a screen door mechanism was
damaged, and the attic door's hook-and-eye lock and interior door frame were damaged.

fleeing Cobalt "just got cut and pasted" into the 949 Iglehart written application.  The state court judge signed the 949 Iglehart warrant at 5:25 p.m.

## II.      DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A.      Section 1983

Whalen asserts claims against Langfellow and Frazer under § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

Because § 1983 is "not itself a source of substantive rights," a court addressing a claim pursuant to § 1983 must "identify the specific constitutional right allegedly infringed."  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation marks omitted).  In addition, "[l]iability for damages [under

§ 1983] is personal, so each defendant's conduct must be independently assessed." *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006).

Langfellow and Frazer seek summary judgment on Whalen's § 1983 claims on the basis of qualified immunity.  "Under the doctrine of qualified immunity, state actors are protected from civil liability when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Sexton v. Martin*, 210 F.3d 905, 909 (8th Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A plaintiff overcomes the defense of qualified immunity by showing that: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation."  *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (quotation marks omitted).  A court may "'exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'"  *Id.* at 1001-02 (quoting *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)).

The qualified immunity question requires a court to assess the facts as they appeared to the state actors.  *Greiner v. City of Champlin*, 27 F.3d 1346, 1354 (8th Cir. 1994).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." (quotation marks omitted)).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

1.      **Fourth Amendment**

a.      ***Falsehoods and omissions in the affidavits***

Whalen contends Langfellow violated the Fourth Amendment because the affidavits he submitted in support of the warrants contained deliberate falsehoods and material omissions. *See Franks v. Delaware*, 438 U.S. 154, 164-65 (1978). An affidavit supporting a search warrant is presumed valid. *Id.* at 171. "A warrant based upon an affidavit containing deliberate falsehood or reckless disregard for the truth violates the Fourth Amendment and subjects the police officer to § 1983 liability." *Morris v. Lanpher*, 563 F.3d 399, 402 (8th Cir. 2009) (quotation marks omitted). An officer is entitled to qualified immunity for an alleged *Franks* violation unless a plaintiff: (1) submits probative evidence that the affidavit contained deliberate falsehoods or a reckless disregard of the truth, and (2) shows that an affidavit reconstructed without the falsehoods and supplemented by the omitted information would not have been sufficient to support a finding of probable cause. *Id.* at 403. "Truthful in this context means that the information put forth is 'believed or appropriately accepted by the affiant as true.'" *Id.* at 402 (quoting *Franks*, 438 U.S. at 165). "A showing of negligence or innocent mistake is not enough to establish a *Franks* violation." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010). "The test for determining whether an affiant's statements were made with reckless disregard for the truth is whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.*

Whalen first argues that the statement that law enforcement saw him leave the duplex in the fleeing Cobalt was intentionally false because it is undisputed that Whalen was in the duplex

when Langfellow drafted the search warrant applications.[4]  Langfellow testified that this

statement was based on information he obtained from the police radio and that he did not

discover that Whalen was not in the Cobalt until after the search of the duplex.  Whalen

submitted no evidence indicating Langfellow knew Whalen was not in the fleeing Cobalt or had

an obvious reason to doubt the accuracy of the radio report when he obtained either search

warrant.[5]  Consequently, Whalen has not shown a *Franks* violation with regard to that

misstatement.

Whalen next asserts that the statement that the numbers for 951 Iglehart were not

displayed was knowingly false.  He submitted no evidence indicating that Langfellow knew the

numbers for 951 Iglehart were displayed or had an obvious reason to doubt the accuracy of the

postal carrier's statement that they were not displayed.  In fact, Whalen testified that the house

numbers for 951 Iglehart were difficult to see.  Because no evidence indicates this misstatement

was anything more than an innocent mistake, Whalen has not shown that its inclusion in the

affidavits constitutes a *Franks* violation.

Whalen also bases his *Franks* claim on the representations in the warrant affidavits that

he co-owned the Arise bookstore with Olson.  It is undisputed that Whalen owned the building in

which the Arise bookstore was located, not the Arise bookstore itself.  Based on Hennepin

County property tax records, the limited partnership Olson, Peterson, & Whalen, Ltd., owned the

building and Whalen paid the most recent taxes on the property.  Whalen testified that he bought

---

[4]     Whalen does not dispute that the Cobalt fled after law enforcement tried to stop it.

[5]     Whalen claims the inclusion of this statement in the written application for 949 Iglehart
was a deliberate falsehood because Langfellow knew that Whalen was not in the Cobalt by the
time he drafted it.  The state court judge issued a telephonic search warrant for 949 Iglehart
before Langfellow knew Whalen was not in the Cobalt.  The unintentional inclusion of an
erroneous statement in an affidavit written after completion of the 949 Iglehart search does not
render a constitutional search unconstitutional.

the building with Olson in 1994 through Olson, Peterson, & Whalen and bought out Olson's

share in the partnership one year later.  No evidence supports a finding that Langfellow knew

Whalen bought out Olson in 1995 or that Langfellow did not believe or appropriately accept,

based on the property tax records, that Whalen and Olson co-owned the Arise bookstore through

the partnership.  Accordingly, Langfellow's failure to distinguish between ownership of the

Arise bookstore and ownership of the building in which the Arise bookstore was located does not

amount to a knowing falsehood or reckless disregard for the truth.  *See Technical Ordnance, Inc.

v. United States*, 244 F.3d 641, 650 (8th Cir. 2001) ("Appellees have not shown any genuine

issue of material fact as to whether [the affiant] intentionally or recklessly made misstatements or

omissions in his affidavit.  Imprecision in the affidavit may show that [the affiant] was careless

in drafting some of the language, but careless error does not show reckless or intentional

misconduct.").  Whalen has not shown a violation of the Fourth Amendment based on those

representations.

Finally, Whalen bases the alleged *Franks* violation on certain omissions in the warrant

affidavits.  To vitiate the warrants based on the omission of certain facts, Whalen must show the

facts were omitted with the intent to make, or in reckless disregard of whether they made, the

affidavit misleading.  *See United States v. Ketzeback*, 358 F.3d 987, 990 (8th Cir. 2004).

Recklessness may be inferred where the omitted information "would have been clearly critical to

the probable cause determination."  *Hunter v. Namanny*, 219 F.3d 825, 830 (8th Cir. 2000).

Whalen identifies as omissions the failure to state (1) that the boxes were addressed to

Tyler, who had received similar heavy boxes for the past two years, (2) that Olson, Peterson, &

Whalen and the Arise bookstore were inactive entities based on Minnesota Secretary of State

records, (3) that the boxes were not leaking, ticking, rattling, or giving off noxious odors, and

(4) that Whalen had never been prosecuted for or convicted of supporting international terrorism. With respect to the first two omissions, no evidence indicates that Langfellow was aware of those facts.  With respect to the third and fourth omissions, "[a] law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not."  *Technical Ordnance*, 244 F.3d at 649.  Whalen identifies no evidence indicating that Langfellow omitted those facts with the intent to mislead.[6]  He contends, however, that recklessness may be inferred because the omissions were critical to the finding of probable cause.  This argument is unpersuasive because, as explained below, probable cause to search 951 and 949 Iglehart would have existed even if the affidavits included the omitted material.

"A warrant is supported by probable cause if there is a fair probability that contraband or evidence of a crime will be found in the place to be searched."  *United States v. Paton*, 535 F.3d 829, 836 (8th Cir. 2008) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)).  Whether there is probable cause is determined based on the totality of the circumstances.  *Id.*  Probable cause exists if the evidence, when considered as a whole, creates a reasonable probability that the search will lead to the discovery of evidence.  *Id.*  Applications and affidavits for issuance of a warrant should be examined using a common sense approach rather than in a hypertechnical manner.  *Technical Ordnance*, 244 F.3d at 649.

If reconstructed to include the omitted matter and exclude the misstatements, the 951 Iglehart affidavit would state that a reliable FBI source had informed the FBI that twenty-one

---

[6]    Further, the Court questions the significance of those omissions.  It is unreasonable to conclude that the state court judge inferred that the boxes were leaking, ticking, rattling, or giving off noxious odors because the affidavit merely described them as "heavy."  Similarly, no reasonable person could believe that the state court judge would assume Whalen had been charged with or convicted of supporting international terrorism when the affidavit only stated that he had been "investigated" for supporting international terrorism.

boxes containing weapons intended to be used during the RNC were delivered to 951 Iglehart on August 30 and that an FBI agent had identified the source and obtained the source's contact information.[7]  It would include the postal carrier's statements that he delivered a large number of boxes to Tyler on August 30, that the boxes were so heavy he could only carry two at a time, that the boxes were not leaking, ticking, rattling, or giving off a noxious odor, and that Tyler had received similar boxes over the past two years.[8]  The affidavit would state that some of the occupants who left the property in a Cobalt fled when the police tried to stop the car.  It would also state that 951 Iglehart was owned by Whalen, who had been investigated for, but not prosecuted for or convicted of, supporting international terrorism in the 1990's.  The affidavit would say that Whalen, through a partnership with Olson, purchased the building in which the Arise bookstore was located in 1994 and had bought out Olson's share the following year.  The affidavit would include Olson's criminal history and recite the statement on the Arise bookstore's website crediting Whalen with giving support and admiration to Olson and advocating violent direct action against police during the RNC.  Finally, the affidavit would state that the Arise bookstore had posted in plain view over the past several months and within the past week statements intended to call people to take violent action during the RNC.[9]

Whalen first argues that the source's tip cannot support a finding of probable cause because there is no evidence that the source was reliable.  "The core question in assessing

---

[7]      Whalen does not dispute that Langfellow believed or appropriately accepted that the FBI received the tip from the source.

[8]      Including the last clause is a stretch.  There is no evidence establishing that the postal carrier said that Tyler had received similar packages in the past or was even aware of this fact. No principle of law requires an affidavit to include information known only to the person whose property was searched.

[9]      Whalen does not contend that the affidavits' description of the Arise bookstore's postings, including his statement expressing support for Olson and advocating direct violent action against police during the RNC, was inaccurate or false.

probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).  Information may be sufficiently reliable to support a probable cause finding if the source has a track record of supplying reliable information or if the information is corroborated by independent evidence.  *Id.* If information from a source is shown to be reliable because of independent corroboration, then it is a permissible inference that the source is reliable and that other information provided by the source, though uncorroborated, is also reliable.  *Id.* at 593-94.  Here, the source's information was partially corroborated when the postal carrier confirmed the delivery of approximately twenty heavy boxes on August 30, 2008.  Based on this corroboration, the source's information that the boxes contained weapons intended to be used during the RNC supports a finding of probable cause.  *See United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) ("Even the corroboration of minor, innocent details can suffice to establish probable cause." (quotation marks omitted)).

Whalen also contends that the information about the investigation of him in the 1990's for supporting international terrorism cannot support a finding of probable cause because it was stale.  Information from an earlier time "may combine with factually connected, recent, time-specific information" to provide a substantial basis for the conclusion that the earlier activity is not stale.  *See United States v. Maxim*, 55 F.3d 394, 395-98 (8th Cir. 1995) (finding that the four-year-old information that defendant typically carried a weapon and stored firearms in a safe in conjunction with four-month-old testimony that defendant continued to carry the weapon and store weapons in a safe supported a finding of probable cause).  Although the investigation of Whalen for supporting international terrorism took place in the 1990's, when considered in conjunction with Whalen's ownership of a building housing an entity calling for violence during

the RNC and the statement on the Arise bookstore's website "crediting" Whalen with supporting Olson and advocating violent direct action against police during the RNC, there was a substantial basis for the state court judge to believe that Whalen supported the commission of terroristic acts during the RNC.

Whalen argues that the inactive status of Olson, Peterson, & Whalen and the Arise bookstore entities detracts from this probability. In light of the ongoing business and protestor activity at the Arise bookstore, the statement referencing Whalen on its website, and Whalen's payment of the property taxes for the building in which it was located, this argument is unpersuasive. Based on the totality of the circumstances, the Court concludes that the reconstructed affidavit for the 951 Iglehart search warrant supported a finding of probable cause.

The 949 Iglehart affidavit, as reconstructed, would contain the same information as the 951 affidavit with the additional detail about Whalen's ownership and control of 949 Iglehart. Whalen maintains that there was no reason to believe the boxes delivered to 951 Iglehart would be located in 949 Iglehart. The boxes were delivered to 951 Iglehart earlier that day and the ongoing surveillance eliminated the possibility that the boxes had been removed from the duplex. Based on those facts and the unfettered access to 949 Iglehart of 951 Iglehart's occupants, there was a reasonable probability that the boxes could be found in 949 Iglehart.

In summary, Whalen's *Franks* claims fail because he has not shown that the affidavits supporting the searches contained deliberate falsehoods or omissions or a reckless disregard for the truth and because there was probable cause to search 949 and 951 Iglehart for boxes containing weapons based on the reconstructed affidavits. Langfellow is therefore entitled to qualified immunity for his procurement of the search warrants for 949 and 951 Iglehart.[10]

---

[10]    Unlike the situation where contraband is found but probable cause is lacking, this case presents a situation where probable cause exists but no contraband is found. It is well-

### b.  Detention prior to execution of search warrant

Whalen asserts a § 1983 claim against Frazer based on his detention within the duplex while the police obtained the search warrant for 951 Iglehart.[11]  Even if the Court assumes that Whalen had been "seized" for Fourth Amendment purposes during that time, "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents."  *Segura v. United States*, 468 U.S. 796, 810 (1984); *see also United States v. Ruiz-Estrada*, 312 F.3d 398, 404 (8th Cir. 2002) ("The act of securing the apartment while awaiting a search warrant comports with the Fourth Amendment.").  In light of the occupants' suspicious behavior after the Wisconsin law enforcement officers' knock-and-talk, including the immediate departure of some of the occupants in a car, securing the premises to prevent removal of the boxes was not an unreasonable seizure.  Frazer is therefore entitled to qualified immunity for Whalen's § 1983 claim based on his detention within 951 Iglehart before the search warrant arrived.[12]

### c.  Knock-and-announce claim

Whalen claims the breaking of the hook-and-eye lock on the 949 Iglehart attic door violated the Fourth Amendment because the warrant did not authorize the police to break down

---

established that the results of a search cannot render an unconstitutional search constitutional. *See Bumper v. North Carolina*, 391 U.S. 543, 548 n.10 (1968) ("Any idea that a search can be justified by what it turns up was long ago rejected in our constitutional jurisprudence."). Similarly, the fact that this search "turned up" vegan literature rather than weapons does not negate the probable cause justifying the warrants.

[11]     At the hearing, Whalen disclaimed any constitutional violation based on his detention during the search itself.

[12]     Because Whalen does not assert that Frazer did not reasonably believe the warrants were valid, any Fourth Amendment claim based on Frazer's reliance on the warrants fails.  *See Mueller v. Tinkham*, 162 F.3d 999, 1004 (8th Cir. 1998) ("An officer is entitled to rely on a warrant that the officer reasonably believes to be valid.").

doors.  An officer's compliance with the common-law knock-and-announce principle is among the factors to be considered in assessing the reasonableness of a search or seizure.  *Wilson v. Arkansas*, 514 U.S. 927, 929 (1995).  According to this principle, a law enforcement officer has the authority to break open the doors of a dwelling, but "first ought to announce his presence and authority."  *Id.*  Whether an officer was justified in forcing entry after announcing his presence and purpose depends upon the circumstances confronting the officer serving the warrant.  *United States v. Lucht*, 18 F.3d 541, 549 (8th Cir. 1994).  The knock-and-announce principle "encompasses circumstances that constitute constructive or reasonably inferred refusal" as well as an affirmative refusal of admittance.[13]  *Id.*

The search of 949 Iglehart took place at about 3:00 p.m. on a Saturday.  The occupants were aware that police were searching the other half of the duplex and had previously sought entry to 949 Iglehart.  The police waited twenty seconds after knocking and announcing before pushing through the door.  Although 949 Iglehart was small, the police were unable to make out any response from the occupants.  Finally, there was probable cause to believe that weapons were located in 949 Iglehart.  Under those circumstances, the Court concludes that the officers did not violate the knock-and-announce requirement when entering 949 Iglehart.  *See Lucht*, 18 F.3d at 549 (finding constructive refusal of admittance where the house was small, the occupants were awake, officers waited twenty seconds after knocking and announcing and before entering, and narcotics were present).  Langfellow and Frazer are entitled to qualified immunity on Whalen's knock-and-announce claim.

---

[13]    The federal knock-and-announce statute, 18 U.S.C. § 3109 (2006), codified the common law.  *United States v. Goodson*, 165 F.3d 610, 614 n.2 (8th Cir. 1999).  Accordingly, cases applying § 3109 provide guidance when interpreting the common-law knock-and-announce requirement.  *Id.*

### 2.    First Amendment

Whalen claims the searches were retaliation for his "free speech challenging police conduct" in violation of the First Amendment.  A plaintiff establishes a prima facie case for retaliation in violation of the First Amendment by showing that "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity."  *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).  Although retaliation need not have been the "sole motive" for the adverse action, it must have been a "substantial factor."  *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007). "Furthermore, the plaintiff must show that the retaliatory motive was a but-for cause of the harm; that is, that the plaintiff was 'singled out' for adverse treatment because of his exercise of constitutional rights."  *Id.*  "A citizen's right to exercise First Amendment freedoms without facing retaliation from government officials is clearly established."  *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010) (quotation marks omitted).

Even if the Court assumes that Whalen engaged in protected conduct, he submitted no evidence establishing that retaliation, rather than the desire to find weapons intended for use at the RNC, motivated the searches.  Whalen therefore cannot succeed on his First Amendment retaliation claim.

Whalen also claims that his detention within 951 Iglehart while the police were waiting for the search warrant impaired his First Amendment right to associate with the journalists from I-Witness Video.  Whalen was not exercising any associational rights with respect to the journalists when he was detained and no evidence suggests that he intended to exercise any such associational rights.  In addition, there is no evidence that his detention was motivated by the

desire to impair his associational rights and his detention within 951 Iglehart while awaiting a

search warrant was constitutional.  For these reasons, Whalen's First Amendment claim fails.

*See Cross v. Mowka*, 547 F.3d 890, 896-97 (8th Cir. 2008) ("Plaintiffs . . . were lawfully arrested

for illegally occupying a condemned building, and their property was properly removed from

that structure.  In these circumstances, their First Amendment claims fail.").

Whalen also suggests that his detention and the searches were intended to chill his future

First Amendment activity but he identified no evidence indicating that the police were so

motivated.  Further, in the absence of any disproportionate police response, a police officer's

decision to enforce the law "in a 'selective' manner . . . to 'chill' future First Amendment activity

that the violator *may* be contemplating" is not unconstitutional.  *See id.* at 897.  Whalen does not

assert any such disproportionate police response.  Therefore, Langfellow and Frazer are entitled

to qualified immunity on Whalen's First Amendment claim because he has not shown a violation

of his First Amendment rights.

**B.      Privacy Protection Act**

Whalen asserts a claim against the City under the Privacy Protection Act.  The Privacy

Protection Act prohibits government officers from "search[ing] for or seiz[ing] any work product

materials possessed by a person reasonably believed to have a purpose to disseminate to the

public a newspaper, book, broadcast, or other similar form of public communication."  42 U.S.C.

§ 2000aa.  Whalen contends that the request to search for and examine any electronic devices

indicates the police knew journalists were present within the duplex.  "An affidavit supporting a

warrant application, however, should not be assessed paragraph by paragraph; it must be

evaluated as a whole."  *United States v. Luloff*, 15 F.3d 763, 767 (8th Cir. 1994) (quotation

marks omitted).  When read in context, the affidavits indicate that the devices and data were

sought to determine the extent of the criminal activity and the identity of any associates.  Whalen conceded at the hearing that this "boilerplate" language is commonly found in search warrants for contraband and that there was no evidence that Langfellow knew journalists were present at the duplex.  No evidence supports a finding that any other City police officer or employee knew journalists were staying in the duplex or that journalistic work product was within.  City police officers could not be searching for journalistic work product in the duplex if they did not know journalists or their work product were present.  The Court grants summary judgment on Whalen's Privacy Protection Act claim.

## C.     State-law tort claims

Whalen asserts state-law claims for false imprisonment, invasion of privacy, and trespass.  Langfellow and Frazer contend that the doctrine of official immunity bars those claims.  Official immunity is a common-law doctrine that provides public officials with a defense to state-law tort claims.  *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006).  Under Minnesota law, officials are generally entitled to official immunity unless the plaintiff shows either: (1) a ministerial duty is either not performed or is performed negligently; or (2) a willful or malicious wrong is committed.  *Schroeder v. St. Louis County*, 708 N.W.2d 497, 505 (Minn. 2006).

"[A] ministerial duty is one in which nothing is left to discretion; it is 'absolute, certain, and imperative, involving merely execution of a specific duty arising from fixed and designated facts.'"  *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 315-16 (Minn. 1998) (quoting *Cook v. Trovatten*, 274 N.W. 165, 167 (1937)).  Generally, police "are not purely ministerial officers, in that many of their duties are of an executive character involving the exercise of discretion."  *Elwood v. Rice County*, 423 N.W.2d 671, 678 (Minn. 1988) (quotation marks omitted).  Determining whether to secure a structure to prevent removal of evidence while

waiting for a search warrant based on the conduct of the occupants and the type of evidence is a discretionary act.  *See id.* at 678-79 (finding decision whether to enter house and arrest suspect in emergency situation discretionary).  Similarly, conducting an investigation prior to seeking a search warrant and deciding which facts should be included in the warrant application requires the exercise of discretion.  *See Johnson v. County of Dakota*, 510 N.W.2d 237, 240-41 (Minn. Ct. App. 1994) (finding acts undertaken during an investigation and subsequent procurement and execution of search warrant discretionary).  The conduct of Langfellow and Frazer alleged to have violated state law was discretionary, not ministerial.

For purposes of official immunity, willful and malicious are synonymous and are defined as "the intentional doing of a wrongful act without legal justification or excuse."  *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991).  "Malice in the context of official immunity means intentionally committing an act that the official has reason to believe is legally prohibited." *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999).  Whalen contends that Langfellow and Frazer are not entitled to official immunity because the searches and his detention were "unlawful."  The Court has concluded that the searches and Whalen's detention were lawful.  Further, even if the Court assumed that Langfellow and Frazer had acted unlawfully, Whalen submitted no evidence establishing that they had reason to know their conduct was prohibited.  Consequently, Langfellow and Frazer are entitled to official immunity for Whalen's state-law tort claims.

Whalen also asserts state-law tort claims against the City based on the actions of Langfellow and Frazer.[14]  The City contends that it is shielded from liability by the doctrine of vicarious official immunity.  Vicarious official immunity protects a governmental entity from

---

[14]     Whalen did not assert § 1983 claims against the City.

liability based on the acts of an employee who is entitled to official immunity.  *Wiederholt*, 581

N.W.2d at 316.  The general rule is that a municipal employer is entitled to vicarious official

immunity if the employee is found to have immunity.  *Pletan v. Gaines*, 494 N.W.2d 38, 42

(Minn. 1992).  Whalen provides no reason why this general rule is inapplicable here.

Accordingly, the City is entitled to vicarious official immunity and the Court grants summary

judgment on Whalen's state-law tort claims.[15]

**D.      Property damage**

Whalen asserts that the City is liable for the $110 damage to his property pursuant to

Minn. Stat. § 626.74 (2008) ("If just compensation is owed for damage caused in the execution

of a search warrant or the apprehension of a criminal suspect, the Minnesota local government

unit employing the peace officer who sought issuance of the warrant or initiated the

apprehension is responsible for paying the compensation.").  Whalen did not allege this claim as

a separate count in his Amended Complaint, but mentioned the statute in his prayer for relief.

Having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction

over this claim.  *See* 28 U.S.C. § 1367(c)(3) (2006); *Johnson v. City of Shorewood*, 360 F.3d

810, 819 (8th Cir. 2004) ("'[I]n the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . .

will point toward declining to exercise jurisdiction over the remaining state-law claims.'"

(quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988))).  The Court dismisses

without prejudice Whalen's claim under Minn. Stat. § 626.74.

---

[15]      At the hearing, counsel for Whalen referred to interrogatories he planned to serve on City
Mayor Chris Coleman and former City Police Chief John Harrington.  Discovery closed on
March 1, 2010.  Whalen has not sought leave of the Court for any modification of the scheduling
order or moved for a continuance pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.
Consequently, Whalen's intention to serve those interrogatories does not provide a basis for
denying summary judgment.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT

IS ORDERED THAT:

1.    Defendants' Motion for Summary Judgment [Docket No. 17] is
       GRANTED.

2.    Counts I-VI and VIII of the Amended Complaint are DISMISSED WITH
       PREJUDICE.[16]

3.    Whalen's claim pursuant to Minn. Stat. § 626.74 is DISMISSED
       WITHOUT PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  August 10, 2010

s/  Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge

---

[16]    The Amended Complaint did not include a Count VII.